UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JABREE A. ELLIS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 25-cv-13629-ADB |
| THE BROOKE CHARTER SCHOOLS, | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Jabree A. Ellis ("Plaintiff") brings civil-rights and First Amendment claims against her former employer, The Brooke Charter Schools ("BCS" or "Defendant") based on her termination from Brooke High School ("BHS"). [ECF No. 6 ("Second Amended Complaint" or "Second Am. Compl.")]. Plaintiff's Second Amended Complaint includes six claims against Defendant, including violations of Title VII of the Civil Rights Act of 1964 (Count I); the Free Exercise Clause of the First Amendment (Count II); the Freedom of Speech Clause of the First Amendment (Count III); the Freedom of Religion Clause under the Massachusetts Constitution (Count IV); Massachusetts General Laws ch. 151B, §§ 4(1), (1A) (Count V); and the Massachusetts Civil Rights Act, Massachusetts General Laws ch. 12, §§ 11H, 11I (Count VI). [Second Am. Compl. at 5–11].

Currently before the court is Defendant's partial motion to dismiss, in which Defendant seeks to dismiss Counts II, III, and VI pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. [ECF No. 9]. Plaintiff opposes Defendant's motion only as to Count III. [ECF No. 11 at 1 ("Opposition" or "Opp.")]. Counts II and VI are, therefore, **<u>DISMISSED</u>**. For the following reasons, Defendant's partial motion to dismiss is **<u>GRANTED</u>** and Count III is also **<u>DISMISSED</u>**.

## I.    BACKGROUND

### A.    Factual Background

The following facts are taken from the Second Amended Complaint, the factual allegations of which are assumed to be true when considering a motion to dismiss. See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (citing Grajales v. P.R. Ports Auth., 682 F.3d 40, 43 (1st Cir.2012)). BCS operates a network of publicly funded charter schools in Boston and Chelsea, Massachusetts. [Second Am. Compl. ¶ 9]; [ECF No. 10 at 2]. During the relevant time period, BCS was publicly funded and regulated by the Massachusetts Department of Elementary and Secondary Education, although it was not part of the Boston Public Schools or under the supervision of the Boston School Committee. [Second Am. Compl. ¶ 9].

Plaintiff was employed as a high school computer science teacher at BHS, part of the BCS network, from July 2019 to August 2024. [Second Am. Compl. ¶ 10]. She alleges that she was the longest tenured computer science teacher in the school's history, that she served her students with "exceptional effort and care," and that, prior to 2024, no student had ever lodged a complaint against her. [Id. ¶ 11].

In July 2024, one of Plaintiff's former computer science students, who was not enrolled at BHS at the time, requested a letter of recommendation from Plaintiff over email. [Second

Am. Compl. ¶ 12]. Plaintiff claims that, although she was under no obligation to write the recommendation letter, she agreed to do so but refused to use the former student's preferred name or pronouns. [Id.]. Plaintiff explained in her email to the student that she could not use the student's preferred pronouns because she "could not lie in accordance with her belief in Christ and His teachings." [Id.]. When the student asked why, Plaintiff responded by explaining her religious beliefs. [Id. ¶ 13].

On August 1, 2024, Plaintiff attended a teacher training event where she was informed by Lauren Horne ("Horne"), the principal at BHS, and Suki Cintron ("Cintron"), the school's Chief People Officer, that her interaction with the former student had been reported to the school. [Second Am. Compl. ¶ 14]. Plaintiff explained to Horne and Cintron that her "sincerely held religious beliefs prevented her from calling students by pronouns that differed from their biological sex," but that she had respectfully interacted with transgender and gender-nonconforming students in the past without incident. [Id. ¶ 15].

The next day, Horne requested a meeting with Plaintiff and told her that her employment was "in jeopardy" unless she "complied with the demand to use preferred names and pronouns." [Second Am. Compl. ¶ 16]. Plaintiff claims that Horne stated that this demand came from the law. [Id.].

Plaintiff met with Cintron and Horne again on August 5, 2025, and reiterated that she had a "spotless record," that her religious beliefs were the basis of her position, and that she had successfully navigated respectful conversations with students who used different pronouns. [Second Am. Compl. ¶ 17]. Plaintiff also told Horne and Clinton that she had no obligation to write the recommendation. [Id.]. Cintron and Horne, meanwhile, allegedly maintained that retaining Plaintiff would make the school "liable." [Id.].

3

Defendant, through Horne and Clinton, terminated "Plaintiff's employment because she would not agree to use preferred names and pronouns." [Second Am. Compl. ¶ 18].  Plaintiff claims that she would have continued her career at BCS had she not been terminated.  [Id. ¶ 19].

### B.    Procedural History

Plaintiff filed her initial complaint against Defendant on December 2, 2025, [ECF No. 1], her first amended complaint on December 9, 2025, [ECF No. 4], and the Second Amended Complaint on January 3, 2026, [Second Am. Compl.].  On February 9, 2026, Defendant filed her partial motion to dismiss Counts II, III, and VI, [ECF No. 9], Plaintiff opposed only with respect to Count III on February 22, 2026, [Opp.], and Defendant replied on March 6, 2026, [ECF No. 14].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the complaint, analyze them in the light most hospitable to the plaintiff's theory, and draw all reasonable inferences from those facts in their favor.  U.S. Ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383–84 (1st Cir. 2011) (citing Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Fed. R. Civ. P. 8(a)(2)). Although detailed factual allegations are not required, a "mechanistic recital of the elements of a claim will not suffice."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Rather, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Id. (quoting Twombly, 550 U.S. at 570).  A plausible claim to relief "does not need to be

4

probable, but it must give rise to more than a mere possibility of liability." Grajales, 682 F.3d at 44–45 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

The Court's plausibility analysis invites "a two-step pavane." Grajales, 682 F.3d at 45 (citing Iqbal, 556 U.S. at 678-79).  First, the Court must "distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)).  Second, the Court must then determine whether the remaining factual allegations "are sufficient to support the 'reasonable inference that the defendant is liable for the misconduct alleged.'" García-Catalán, 734 F.3d at 103 (quoting Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)).

## III.      DISCUSSION

In Count III, Plaintiff alleges that Defendant violated her free speech rights under the First Amendment by attempting to coerce her speech under the threat of termination of her employment.  [Second Am. Compl. ¶ 43].  Plaintiff does not allege that she was terminated because she refused to write the recommendation letter using the former student's preferred pronouns, but instead claims more generally that she was fired because she refused to comply with BCS's requirement that teachers use students' "preferred names and pronouns." [Second Am. Compl. ¶¶ 16, 18]; see [Opp. at 3 ("Ellis was given an unjust ultimatum by [BCS]: either use transgender students' preferred pronouns in violation of your personal convictions or lose your job.")].  Defendant argues that Plaintiff has failed to state a claim under the Free Speech Clause because Plaintiff's speech was not made as a public citizen on a matter of public concern, but instead in her professional capacity.  [ECF No. 10 at 8].

The "constitutional safeguard" of freedom of expression "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) (quoting Roth v. United States, 354 U.S. 476, 484 (1957)).  The ability to "speak one's mind" is a "prized American privilege," and is afforded for both "vigorous advocacy" and "abstract discussion." Id. (first quoting Bridges v. California, 314 U.S. 252, 270 (1941); then quoting N.A.A.C.P. v. Button, 371 U.S. 415, 429 (1963)).  The First Amendment's protections extend to public employees, although subject to certain limitations.  See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." (citing Waters v. Churchill, 511 U.S. 661, 671 (1994))); Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) ("Government employees undoubtedly walk a tight rope when it comes to speaking out on issues that touch upon their fields of work and expertise.").  Although teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969), their free speech rights are "[not] so boundless that they may deliver any message to anyone anytime they wish," Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 527 (2022).  "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418 (citing Connick v. Myers, 461 U.S. 138, 143 (1983)).

The First Circuit uses a three-step inquiry to determine whether an adverse employment action violated a public employee's First Amendment right to free speech. Hussey v. City of Cambridge, 720 F. Supp. 3d 41, 53 (D. Mass. 2024) (citing Bruce v. Worcester Reg'l Transit

Auth., 34 F.4th 129, (1st Cir. 2022)).  "This inquiry is modeled after the balancing test initially articulated in Pickering."  Id. (citing Pickering v. Bd. of Educ. of High Sch. Dist. 205, 391 U.S. 563, 563 (1968)).

For the first step, the Court must evaluate whether Plaintiff plausibly alleged that she "spoke as a citizen on a matter of public concern."  Gilbert v. City of Chicopee, 915 F.3d 74, 82 (1st Cir. 2019) (quoting Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007)).  "In making this determination, we ask whether the 'speech' underlying [Plaintiff's] claim was made 'pursuant to [her] official duties.'"  Id. (quoting Garcetti, 547 U.S. at 421).  When evaluating whether speech by a public employee was made in a professional or private capacity, the Court looks to the following "non-exclusive" factors:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

Gilbert, 915 F.3d at 82 (citing Decotiis, 635 F.3d at 32).  Additionally, "in identifying [the plaintiff's] job responsibilities, the proper inquiry is 'practical' rather than formal, focusing on 'the duties [she] actually is expected to perform.'"  Mercado-Berrios v. Cancel-Alegría, 611 F.3d 18, 26 (1st Cir. 2010) (citing Garcetti, 547 U.S. at 424–25).  "If the Court finds that the speech in question was made pursuant to the speaker's official duties, then there is no First Amendment claim, as '[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties.'"  Hussey, 720 F. Supp. 3d at 53 (quoting Gilbert, 915 F.3d at 82).

7

"[I]f the employee did speak as a matter of public concern," the second step then involves evaluating "whether the government entity involved had an adequate justification, based on the impact to its own operations, for the action it took towards that employee." Hussey, 720 F. Supp. 3d at 53 (citing Bruce, 34 F.4th at 135).  For the third step, "the Court looks to whether the protected speech was a substantial or motivating factor in the adverse employment action." Id. (citing Bruce, 34 F.4th at 135).

With respect to the first step of the inquiry, Defendant argues that Plaintiff's speech was made pursuant to her official duties and did not relate to a matter of public concern.  [ECF No. 10 at 8].  Plaintiff responds that her speech was noncurricular and undertaken as a citizen on the subject of transgender rights, which she contends is a matter of public concern.  [Opp. at 5].

Courts around the country are divided as to whether a teacher's refusal to comply with their employer's policy to use students' preferred pronouns is protected under the Free Speech Clause, with some finding that it is not protected, see, e.g., Polk v. Montgomery Cnty Pub. Schs., 166 F.4th 400, 418–19 (4th Cir. 2026); Kluge v. Brownsburg Comm. Sch. Corp., 432 F. Supp. 3d 823, 838–39 (S.D. Ind. 2020); Ramirez v. Oakland Unified Sch. Dist., No. 24-cv-09223, 2025 WL 1507092, at *8 (N.D. Cal. 2025); Willey v. Sweetwater Cnty Sch. Dist. No. 1 Board of Trustees, 680 F.Supp.3d 1250, 1287 (D. Wyo. 2023); Sullivan v. Unified Sch. Dist. No. 512, Johnson Cnty, Kan, No. 24-cv-02491, 2025 WL 2732589, at *14 (D. Kan. Sep. 25, 2025), and others finding that it is, see Meriwether v. Hartop, 992 F.3d 492, 504–12 (6th Cir. 2021) (finding that university violated professor's First Amendment rights by requiring him to use students'

8

preferred names and pronouns in class)[1]; Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ., No. 22-cv-02237, 2024 WL 3758499, at *11–16 (N.D. Ohio Aug. 12, 2024) (finding that preferred pronoun usage was not "in-class curricular speech" or otherwise pursuant to teacher's official duties, but denying plaintiff's motion for summary judgment due to factual disputes implicated in the Pickering test); Vlaming v. W. Point Sch. Bd., 895 S.E.2d 705, 738–44 (Va. 2023) (finding that the plaintiff stated legally viable claim that his free speech rights under the Constitution of Virginia were violated).

Here, with respect to step one of the Pickering test, the Court finds that the speech at issue, specifically the requirement that Plaintiff comply with the BCS policy to use students' preferred names and pronouns, was part of Plaintiff's official duties as a BCS employee. Looking to the factors set forth in Gilbert, addressing students, particularly in the classroom, is essential to teaching. A teacher's official job-related duties, for which she is compensated, require her to communicate with students at her place of employment, including by addressing them in accord with school policy. See Kluge, 432 F. Supp. 3d at 839 ("how teachers relate to

---

[1] The Court notes that the factual situation and First Amendment analysis in Meriwether, which involved a university professor, are distinguishable from the circumstances here, given the difference in academic freedoms afforded to primary and secondary school teachers as opposed to university professors. Meriwether, 992 F.3d at 498 ("Traditionally, American universities have been beacons of intellectual diversity and academic freedom."). The First Circuit has found there to be compelling "reasons for treating curricular speech by college and university faculty differently from similar speech by primary and secondary school teachers." Local 8027, AFT-N.H., AFL-CIO v. Edelblut, 651 F. Supp. 444, 452 (1st Cir. 2023) ("Public primary and secondary school teachers . . . are hired to teach the curriculum developed by the politically accountable branches of state and local government. Individual primary and secondary school teachers simply aren't given the latitude to teach whatever they believe students need to hear."). "College and university faculty also teach their classes in a very different environment from the world of primary and secondary education. No one is required to attend a public college or university, but primary and secondary school education is compulsory, and most families lack either the financial means or the spare time to satisfy the requirement through private schools or home schooling." Id.

students <u>is</u> part of their jobs") (emphasis in original).  When a teacher addresses students, particularly in the classroom, on school grounds, or through official school channels of communication, a teacher generally projects the impression that she is representing her employer.  While a teacher's act of addressing a student is not typically described as "up the chain" communication, to teach effectively, which is inherent in the job duties, requires a teacher to interact with students in a way that does not create a barrier to learning or an unnecessary distraction.  In sum, "how a teacher addresses a particular student in a particular classroom . . . is merely a part of that teacher's job description," and therefore "does not concern the speech of a private citizen."  <u>Polk</u>, 166 F.4th at 418.

With regards to the letter of recommendation, which again is not the basis of Plaintiff's free speech claim, although writing letters of recommendation may not be part of a teacher's principal responsibilities[2]—that is, instructing students on academic curriculum—it is still within the realm of a teacher's traditional and typical duties.  Recommendation letters are typically written about and derived from knowledge of a student's classroom performance, communicated via official school channels such as email or letterhead, <u>see</u> <u>Griffin v. Univ. of Me. Sys.</u>, No. 22-cv-00212, 2023 WL 5279660, at *6 (D. Me. Aug. 16, 2023) (stating that speech communicated via employee's official work email address weighed in favor of finding that speech was made pursuant to official duties); <u>cf.</u> <u>Meagher v. Andover Sch. Comm.</u>, 94 F. Supp. 3d 21, 37 (D. Mass. 2015) (stating that teacher's use of personal email account on her personal computer supported conclusion that she was speaking as a citizen), and arise generally out of a teacher's

---

[2] The Court notes that Plaintiff has not argued in her Opposition that the speech in connection with the recommendation letter was outside of Plaintiff's official duties.  <u>See</u> [Opp.].  In fact, Plaintiff's only mention of the official duties consideration comes in the form of a conclusory statement that the use of preferred names and pronouns is "noncurricular speech."  [<u>Id.</u> at 5].

10

employment, see Jakuttis v. Town of Dracut, 656 F. Supp. 3d 302, 329 (D. Mass. 2023); Decotiis, 635 F.3d at 33 ("it is not determinative that an employee was not required to make the speech at issue").  The Court, however, need not reach a conclusion as to whether the speech that Plaintiff would have made in connection with the recommendation letter referenced in her complaint would have been a part of her official duties because Plaintiff does not specifically allege or otherwise argue that her refusal to write the letter was the reason for her termination or the basis for her free speech claim.  See [Second Am. Compl. ¶¶ 16, 18]; see generally [Opp.].

Plaintiff does argue that the compelled nature of the speech required by the pronoun policy is particularly egregious, [Opp. at 3], and it is true that "[w]hen a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different."  Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31, 585 U.S. 878, 908 (2018).  The Supreme Court has, however, also stated that "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message."  Id. (citing Garcetti, 547 U.S. at 421–22, 425–26).  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline."  Garcetti, 457 U.S. at 421.  That is the case here, where, as explained above, the speech at issue was part of Plaintiff's official duties as a BHS teacher and BCS employee.  See Polk, 166 F.4th at 419 (stating that Janus "actually bolsters the [defendant's] argument that governmental entities can control speech made pursuant to an employee's official duties").

Further, even if Plaintiff's speech fell outside of her official duties, her speech did not involve a matter of public concern.  Plaintiff's argument that she satisfies the second aspect of

step one of the <u>Pickering</u> analysis because transgender rights are a matter of public concern and affect "numerous segments of society," [Opp. at 5], holds little water.  Put simply, "the act of referring to a particular student by a particular name does not contribute to the broader public debate on transgender issues." <u>Kluge</u>, 432 F. Supp. 3d at 839 (finding that "choosing the name to call a student constituted a private interaction with that individual student and a private statement about [the teacher's] subjective perception of that student").  Plaintiff's use of a specific name or set of pronouns to address a particular student in her classroom or in the course of other teacher duties is not the "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," <u>Polk v. Montgomery Cnty Pub. Schs.</u>, No. 24-cv-01487, 2025 WL 240996, at *17 n.11 (D. Md. Jan. 17, 2025), or intended to reach a broad public audience, <u>see</u> <u>Snyder v. Phelps</u>, 562 U.S. 443, 454 (2011); <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 759 (1985) ("speech on matters of purely private concern is of less First Amendment concern"); <u>Ramirez</u>, 2025 WL 1507092, at *9 (finding that even if the plaintiff "had been acting as a citizen, her refusal to use the student's preferred pronouns was not speech on a matter of public concern").

Because the Court finds that Plaintiff has not satisfied the requirements of step one under the <u>Pickering</u> test, it need not discuss the remaining two steps.  Accordingly, Plaintiff has failed to allege that her First Amendment right to freedom of speech was violated, and Count III is hereby **<u>DISMISSED.</u>**

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss counts II, III, and VI is

**GRANTED**, and counts II, III, and VI of Plaintiff's Second Amended Complaint are

**DISMISSED**.

**SO ORDERED.**

August 13, 2026                                                    */s/ Allison D. Burroughs*
                                                                    ALLISON D. BURROUGHS
                                                                    U.S. DISTRICT JUDGE